May it please the Court, I am Brandon Grable for Appellate Iman Kimichi. This case can be resolved in five sentences that Officer Pethel had announced on her body camera. Specifically, she said, let me get your name before you leave. Since I spoke with you, I need to have your name. You were detained, so you need to give me your name. Give me your name or else you're under arrest. Just give me your name so I don't have to take you to jail for this. So rather than give his name, as Mr. Kimichi's right was not to, he was placed under arrest and put in jail for a couple of days. And the Court, so these facts are not disputed. It's on the record. It's on video. But the trial court at 12b-6 disregarded those facts and instead went down a separate timeline to determine that there was probable cause for interference because Kimichi was apparently somehow stopping a tow. But what the record actually shows is that there's no probable cause for the interference. There's no probable cause for the failure to identify. That's what I don't understand that the district court order, this may be a friendly question. It seems to say that at the simultaneously that he, as he was being arrested, there was some statement made that it was because of him interfering with the tow. And I don't hear that or see that on any of the videos, that it was simultaneous to the, it seemed to be, as you said, give me your name or you're under arrest. But I didn't hear the part or see the part about that, oh, it's because you've interfered with the tow. So can you help me? Where did the trial court get that? And what is that coming from? Your Honor, I'll ask them, of course. Yeah, that's, that's the problem. I don't, I don't see that in the video either. What the trial court essentially did to avoid the Turner v. Driver law, which says that, you know, you can't arrest somebody for not identifying. What he did to avoid that was he essentially said, well, since Officer Pethold showed up to the scene and he was standing in the street and stopping the tow, he must have been interfering. So that created a basis then to ask him for his ID. But when you look at the police report, you look at the video, it was very clear that once he acknowledged that the tow was taking place, he, he was going to leave. He's over on the corner. I mean, not, I thought when they started the car, I mean, started the truck, you could hear the engine start, that they were taking it away then. But then I realized, oh, they're not taking it away yet. I kept thinking they were going to take it away while we would see it being taken away because he was no longer anywhere near it and he was on the sidewalk. Yes, Your Honor. And that's a, that's another point I want to bring up too with the interference piece. Even, even if you were to play the gymnastics to get there, the reality is there was a question of whether or not he was actually interfering or exercising his right under the ordinance. Because under Texas law, in order to have interference, you have to have criminal negligence. And the way criminal negligence is defined in the statute is a gross deviation from the actor's standpoint. So when they're all discussing whether or not he has a right to reclaim the video, or reclaim the tow or the vehicle, that's not a gross deviation. Matter of fact, officers are on the scene there trying to figure out, could he even get a drop, can he pay a drop fee? And in fact, he could pay a drop fee. And that's why I don't understand why poor Mr. Anderson's client is here at all. So you need to tell me why Mr. Anderson's client is even, what did Mr. Anderson's client do? You're talking about the tow truck driver? The tow truck driver, the tow truck driver's happy to take the fee and move on his merry way. He's doing his job under the statute. Really, they didn't have permission to park at the park or under the municipal ordinance. So why is the tow truck driver being sued? Yes, Your Honor, we brought state law claims, specifically, that says you can't tow a vehicle with someone inside. I want to be clear that according to the complaint, Mr. Camichi is the one that called 911. Right, but he jumped and leapt in at the time. It was already in the process. It wasn't fully hooked up. He jumped in. Is that really, did he? So that's the thing, Your Honor, is under the ordinance and under state law, you can't tow a vehicle. So if you jump in the vehicle to try to, as it's already undergoing, you think you're the one that has a claim? Your Honor, under state law, so it's a strict liability. And let me be clear, I want to be crystal clear on this. After discovery, with a full record on summary judgment, if it gets that far, could we lose those state law claims? Absolutely. Is there any factual issue? He jumped in the vehicle after it was already starting. Maybe he wasn't fully hooked up, but he was jumping in in order to try to stop the tow. Yes, Your Honor, but the state law is clear on this. The state law is clear that you cannot tow a vehicle with somebody in it. The ordinance is clear that you have to release the vehicle when someone's in it. So that's the factual issue, is under the ordinance, he should have given up the. Okay, I thought you were going to concede that he didn't really do anything wrong, but I got you. It's okay. You're free to make your arguments on his behalf. Let's get back to the officers. Mr. Montgomery's brief says something that is troubling to me, but might be the law, that you can, after the fact, come up with your reasoning. And while that wasn't part of your probable cause for the arrest or detention, you can think about it and go back to the office and say, oh, I have a new reason, and that gives me reason to do what I've done already, and that we somehow have blessed that. Can you address that, please? Yes, Your Honor. I believe you're talking about the counsel's representation of the Devenpeck case, which essentially is asking to look at the objective facts, not the officer's subjective motivations. Does it say you can go back to the office and think of a new reason after the fact, it wasn't there on the scene, or that you do it after you've already made the decision? I don't think that's the case at all, Your Honor. I think what the purpose of when you have that case specifically is to say, look at the objective facts that were available to the officer, and the objective facts that were available to the officer, even if you think about it, was that there was a question about whether or not they could release the tow, whether or not, and once they decided they were going to tow it, he was going to walk away, and objectively, the information was they were under the impression, right or wrong, that because they had spoken with Mr. Camichi, they had to get his information under threat of arrest. That's objectively what exists, so. And that's not the law? You didn't, it's, is it clearly established that that's not the law? That's clearly established that's not the, yes, Your Honor, Turner v. Driver, that's. And we've held that since then in other cases. Yes, Your Honor. You do not have to identify yourself at that point? Correct, Your Honor. Since 2017, well, and that specific provision under the Texas Penal Code has existed before 2017, but that's the case we cited as clearly established, that under Texas law, you only have to identify yourself if you are lawfully arrested. And it was very clear that once everybody agreed that the vehicle was getting towed, he was on his way, and then at that point, that's when they decided to arrest him because he wouldn't identify himself. So our contention, of course, Your Honor, is there's no probable cause, and it violated clearly established law. So if you were to prevail here, you would prevail that, what would happen? What would we write? Your Honor, you would essentially write that the court violated the tolling standard by construing facts disputed or undisputed, not in Camichi's favor, which he was required to do at the 12B6 stage. Or even in conjunction with the Scott v. Harris case. Or even... Or both of them. It both didn't construe the facts in the light, or in light of the video, or in light of the plaintiff. That's exactly right, Your Honor. Okay, and so therefore, we send it back for further proceedings, whatever those would be. Yes, Your Honor, and at that point, we would develop a record, get evidence, and then... Only on the probable cause for arrest, what would be the, what claim would remain? Well, we think all the claims would remain because we have the false arrest issue. We also have the unlawful search and sent to an unlawful arrest. What unlawful search? So they searched his... Well, so there's two aspects to this. The first is, they did a pat-down that we contend exceeds the bounds of Terry. Because once Officer Petho immediately showed up, she immediately approached my client, Mr. Camichi, and said that he was acting hostile and irate. That's what she put in her report, at least. And so, extremely hostile, extremely irate. So in that response, she decided to do a Terry pat-down, so she claimed, but... Well, but what case law says she can't do a Terry pat-down with him while he's on the sidewalk close to her if they ever are going to have a big discussion and he's been upset, even if he's calmed down then? Why can't she do a Terry pat-down at that point? You know, the law has gotten... We're a long way from Terry and the case allegedly casing the jewelry store or whatever it was at the time. We're a long way from that, and they let people get pat-downs all the time. So what case says that? Yes, Your Honor, the first and foremost, Terry v. Ohio, you have to have both, right? Suspicion that criminal activity is afoot, but you also have to believe the suspect is armed and dangerous. Right, but what's the case that would tell a reasonable officer that, under the circumstances where you're going to have a conversation with them after they've been upset about their vehicle being towed... Sure, Your Honor. ...that you can't pat them down before you continue to converse? So Monsavius, we said in our brief, pages 20 and 21, 848 F3D 353, and that specifically talks about how officers aren't supposed to weigh nervousness or behavior or attitude right in their overall analysis. But we also, even if we were to concede like the officer could do a Terry stop, it's limited to a pat-down of the outer portion of the clothes. She went into his pockets. The complaint also asserts that she was feeling around his genitals as well, and that it was beyond just the Terry stop. It was intrusive, and there was no reason for it. So that's what our complaint asserts, Your Honor. The scope of the Terry stop. The scope of the... That took a pat-down. Yes, Your Honor. Do you agree that the police had a right to remove the truck? I don't agree, Your Honor. Why not? Because... It had been parked. It had been marked. A number of days had expired since it was marked. Yes, Your Honor. And they have an ordinance in connection with that. Yes, Your Honor. Why wasn't it lawful for them to remove it? So it was lawful to remove the vehicle if it was fully hooked up and on the property, what it appears. Again, we don't have a record on how the tow truck got from the parking lot to the street. But once the tow truck driver... The tow truck driver admitted on video that he was never 100% hooked up to it. And the ordinance makes clear that an operator or an agent can reclaim the vehicle without any fees if it's not 100% hooked up. So which one was Mr. Camici? Because the ordinance says owner, authorized operator, or authorized agent of the owner. Which one was he? He was the authorized agent of the operator, Your Honor. So if you look under BIRB v. United States, which talks about the standards of Fifth Circuit case, and we cite that as well in our brief, 52 and 53, the specific standard is reasonable expectation of privacy. And even if what the court has held in the past in the United States v. BIRB case is even if you're not on the rental agreement, but you have the authority of the person who is, then you... Because the owner is a rimless, right? I would argue, Your Honor... I mean, his relative didn't own the truck. Your Honor, if you look at United States v. BIRB, it expands that authority or that recognition under... Even if a driver or operator or agent is not on the rental agreement, they still have specific to standing to assert that claim. And so this is, in my opinion, not a disputed issue. It's because the case law makes clear that even if you're not on the rental agreement, it doesn't matter. And your position is he didn't interfere with their right to remove the truck? He did not interfere, Your Honor, because if you watch the video, even while he's inside the vehicle and he's calling 911, the tow truck driver is still hooking up the vehicle. He's still going on with his business. And even when he proceeds to get out, Camiche is telling the officer, can you back up? I don't want to hit you with the door. And then when the door opens, the tow truck driver then instructs him to scoot over so he can get in the driver's seat. Camiche does that. And then at some point, he proceeds to get out. And the whole time, the tow truck driver is... He's hooking up the vehicle. And Camiche's not stopping him with that at all. So specific to the tow truck driver, there is no... We don't think there is any interference whatsoever. But again, it goes to prove our point of the gross deviation that would be required for interference, because they're even talking about how can we get the tow truck vehicle back to Mr. Camiche. If we disagreed with you about the Terry stop, pat down, what... Is it just a false arrest? What claim would go back? Your Honor, we have the false arrests. We also have the state claims. And I have to go back and look. I believe we also were challenging a First Amendment retaliation because he was criticizing their conduct. And so that formed the basis of what we're going to put this guy in jail. Again, we're really early in the process. So I'm just trying to figure out what claims would go back if you were successful. That's not a bad question to be asked, although it's not foreshadowing. Yes, Your Honor. If I had it obviously my way, I would prefer that all claims survive and we go, we develop a record, and we hash it out for summary judgment. But the reality is, at the very least, the claim that I think should absolutely go forward is the false arrest, because it's clear from the record, objectively, he was arrested for failing to identify. Thank you. Thank you. Thank you, Mr. Grable. We'll hear from Mr. Montgomery. Almost afternoon. Yes. Please, the panel. To begin with, it's on the video, is the thing that I want to stress. All these arguments that were made are his interpretation. In some cases, I'm not arguing that he intentionally misrepresented things to this Court. But statements are being misrepresented as to what's on the video. To answer Judge Elrod's question about where does it talk about her telling him what he's under arrest for, it's under the Hamilton Body Video 655-704. He asked the specific question, what am I being arrested for? Her answer, you're being arrested for a failure, I mean, that he's being arrested for interference with public duties. That's the only thing that she said. And then one of the officers That was after she had told him you would either give me your name or you would be. It's like an either or. It's give me your name or else you're under arrest. Understood. Now, that's not that he was not under arrest. I'm sorry. Was that proper to threat that either you give me your name or you're going to be under arrest? Was that lawful command? If, in fact, if you're asking just on the charge of failure to identify, that's not enough to arrest him. Which is what it seems like he was arrested on, because immediately after he said no, then she said, okay, you're under arrest. Actually, if you say you're under arrest because of this other reason, she said, because you, okay, you're not going to give me your name. Come on, give me your name. Just give me your name. I don't want to arrest you. And then, okay, you're not going to give me your name. You're under arrest. Your Honor, what we do know before all of that even happened is before she arrived back, and so for purposes of, because I do want to address that. I think that's a very important point. So the beginning of this tow truck towing occurred 20 minutes before he ever jumped into the cab of the truck trying to be the hero to stop the truck. That occurred 20 minutes. It occurred at a different location. The truck was already towed from the parked location in the park to a public street. As Judge Graves was asking, if you read the ordinance 90-94, it says if an owner, authorized operator, authorized agent of the owner of the motor vehicle, if that person comes and gets to it before it's hooked up, but it also says, which I agree with Judge Graves, and I think counsel here will as well, he doesn't qualify under any of those, period. He comes back later and says, oh, well, I gave him some of the money for it. That's not what the law says. But it says before its removal from the property or parked location, he has the right to do the, not mean to jump up there and do what he did. And then the definition under 90-82, before its removal from the property, states that it shall mean the time period until the tow truck enters a public street, road, or highway. It already did. So once that happened, he didn't have the right to get it back either.  Assuming that's all true, it seems like there's still a fact issue of whether he was arrested for somehow standing in the street and talking about that and jumping in the truck at one point, or whether he was arrested because he failed to give his name, because he kind of got up in there with that other officer who didn't want to give his badge number, which was kind of, everybody else gave their badge number and acted appropriately, and then that one officer didn't, and then he, but she said, no, you give me your name. And then he didn't want to give his name, and then she said, you're going to be arrested for that. And so she didn't say you're going to be arrested for what you did 20 minutes ago, standing in the street talking to the other officers before I got here. It seems like there's at least a fact issue on that, and we have to construe it in the light most favorable to the plaintiff. And we've got the video that supports the plaintiff. Which is exactly my next point. We also have the video of what occurred before that. Yeah, but that doesn't mean that why she's arresting him. I'm about to address that. Okay. If you, in the Hamilton video, which is appellate 38, and it starts at 133 to 139, Officer Hamilton, a number of times, I'm just going to read the four real quick quotes, so you know you are obstructing, if it's already towing, you can't just hop in. So it's not like we're making this up after the court said, can you go back home and come up with a charge. That comp, that when she told him she was under arrest for interference, that was as she was putting the cuffs on him at the car on the video. Right, but they never were going to arrest him for that. Okay. They were not going to arrest him for obstructing. They were about ready to get everybody. They said, we'll let you go. You can pay the fee if you want to get the truck back. Well, if I can get through these four quotes, then I want to come. Get through the four quotes. Go ahead. I'm sorry. The second one, you're obstructing, man. He's already doing his job, but now you're, third one, but now you're obstructing for the police. This is a police notice. Fourth one, I'm telling you to step out. I'm giving you a lawful order. So the court asked the question of could they have given the truck back? And that also was on the Hamilton video, 1345 to 1425. And that's very important because initially the tow truck operator thought that he could give the truck back. That's even assuming that you believe that the statute applies to him because it was moved to a public street. Right. The tow truck driver absolutely thought he could give it back. And the officer who was on the scene first thought that it was okay. He said, y'all work this out. You can give the money back. He paid the 250, and then they were going to go on their own way. But the tow truck driver did say, 1345 to 1425, he talks about being there for 20 minutes. He said he had to pull over and I drove it here. I parked it here. He was realigning it and backing it up. He goes, this is my, he goes, this is a Penske truck. So that means the only person I can release the vehicle to is the person on the Penske contract. So either way, I couldn't have done the drop fee. That's after the fact. That's at the scene before, yeah, as he's being arrested. Yeah, that's after the fact. They had already, though, had a prior conversation where he was going to take the money and go. And it was just a matter of the plaintiff not wanting to give the money at that point and saying he didn't want to give the money. Well, actually what he did is he dropped his cell phones, put his hands behind his back and said, take me to jail. Well, before that, before even the second group of officers arrived, they were going to do the deal. And in fact, the first set of officers encouraged that to just, why don't you just, and so it was a positive thing that they could do that. So the question is, is not whether they had the power to arrest him for obstructing for his, but whether or not that was why he was being arrested. The only evidence, the only evidence that's before this court is that was the reason he did. No, the evidence we have is she said, you either give me your name or I'm arresting you. And then he said, no, I'm not giving you my name. And then she said, OK, then you're under arrest. In fact, as evidence in this case, it's before the court, it's her accident, I mean, it's her incident report in which she's. I thought her statement at the scene was her best evidence in the case. Well, it was, but they also attached it to their complaint as well. So it's before the court as well. OK, I'm talking about what's the, it seems like there's conflicting evidence. I understand. It's not 12 v. 6. Well, it is in that she reasonably believed that the reason, and she never unequivocated from the reason for the arrest was the failure, was the interference with public duties. It's unequivocal. And if you go back and she wasn't there at the beginning, and Officer Hamilton even said, I would add failure to ID to it. And she said, I was going to do that. Right. So they both were clear in their minds and in what their actions were that he was being arrested for the interference with public duties and that they were adding failure to ID as a part of it. Why did they not, why were they in one moment going to let him go and then in one moment deciding to, what kind of obstruction did he do in the moment between being let go, when they said, we're going to let you go if you just give us your name? And then him not giving his name. What kind of obstruction did he do at that point that would have said, no, you're obstructing again. And so that's, you can't go. Well, Your Honor, I believe if you go back to what the definition of failure to interfere with public duties is, they commit that crime if they interrupt, disrupt, impede, or otherwise interfere with the peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law. That's. Now, what did he do to do that at the time period when the officer of Pethel was there? Your Honor, I think, no offense to the court when I say this, I think you're departmentalizing an evolving situation as it's going on. We don't always get this look at what's going on at a scene, but we have body cam. So we're, and counsel put it into evidence, and I say that because this situation isn't that unusual in many situations. We have body cam all the time now. I understand. And it's totally changed the way we do our jobs at the Court of Appeals now because the Supreme Court has specific, and I'll give you the time back. But the Supreme Court has specifically told us that we can have the view of the video override anything else in the record, even decisions made by the district court. There is, it's not clear law that 12b6, we can use the body cam, but everyone here is using the body cam and seems to think it's perfectly fine, so we're not, that's not an issue raised. But district courts differ on that, a 12b6 stage, but nobody's saying we can't be looking at the video here, so we're looking at the video. But we do this every day now, and if we're told that what's said on the video and what's done on the video overrides things if it clearly shows something, and that's what the Supreme Court told us to do. Even if we don't like that, and even if that changes the way we do our job as just an inferior middle management appeals court. Your Honor, and with that, and I understand what the court's saying, I think two things here. One, I think you have to go back and look, as again, as he's being arrested, the only time he's asked the question, what am I being arrested for, she flat out tells him exactly what I've been telling the court here today, failure to interfere with public duty and failure to ID. Now, the other thing, too, that I don't want lost here is qualified immunity is an important concept here that shouldn't be lost. It exists when you look at the totality of the circumstances, and I know I'm not going to recite every case to the court because you live it every day, much like I do. You have to look to see if it was a reasonable person to conclude. Let me ask you another question about this. With basic police stops, once you have a basic police stop, an officer has a right to tell you to get out of the car, and without any other reason, to get out of the car, that's to protect the officer, and the officer has the right then to get some identification. One way to read these facts is that she had determined that she was not going to arrest him for interfering, and that things had moved on, and then she said, by the way, I need a name, name for what, name for what occurred before, for her report, and he didn't want to do it, and so she said, well, if you're not going to cooperate, then he didn't want to cooperate. That's the way I read the fact. Right, and she said, you have been, you were detained, and she specifically says that on the record as well, which is really important. You were, I need to know your name. You have been detained. Well, she tells you, I need to know your name for what. Well, it needs a name. I thought she was saying I needed to complete my report about what's earlier happened, and what had earlier happened. She had made no attempt to arrest him. Right. She didn't make any, yeah. And at that point in time, he wasn't under arrest at the time that conversation occurred, and I think it's just important for the court to understand that. It's a good law school hypothetical. And I tell the court, and I know I'm going to repeat myself because I'm out of time, and I'm going to sit down. I told you I'd give you a minute or so. Yeah, I appreciate it. Go back. The question is, was he interfering with public duties? Go back and read that statute because they're going to say that it wasn't hooked up. When you read that statute, that hooked up part is assuming it hasn't been moved and moved into a public street. He committed the crime. Officers did what reasonable officers would do. I think you're going to find they actually were very cordial in the whole process. And this pat down, again, it's all on video. There's nothing wrong with what she did. She was very cordial with everything she did, and him being offended by it is not going to rise to the level of a constitutional violation. I appreciate the court's time. May it please the court. My name is Dylan Anderson, and I'm here on behalf of B&B Wrecker and Burt Gibbons. And, Your Honor, I agree with your first question. What did poor Mr. Anderson's clients do? I'm not exactly sure. That's a good question to get in. We've spent a lot, a large part of this morning discussing the underlying facts from the perspective of the police officers and Mr. Camici. But I'd like to take a moment just to refocus on the facts from my client's perspective, whose role in this case is wholly distinct from the police officers. And my clients are the towing company and their employee, the tow truck driver. And so the following is the series of events leading to this lawsuit, not as told by me, but that appears in Mr. Camici's pleadings and the evidence attached thereto. One, on September 22nd, 2024, my client was called by the police to tow a Penske truck that had been red-tagged as abandoned almost a week prior to the date that my client showed up on the scene. My client arrives and, in fact, finds the Penske truck with no owner around at the Euless City Dog Park. My client spends over 20 minutes hooking up the vehicle, tows it out to the street to finish the process. And, you know, while he's in the middle of the street, it's only as Mr. Camici, who happens to be walking his dog in the area, runs over and interrupts this tow and jumps inside of the truck as the tow is ongoing. And we know how the story goes from here. Mr. Camici calls the police, subsequently escalates the situation, and that might be my view, but ultimately gets himself arrested. And at this point, the Penske truck is returned to his previous state of abandonment. It's in the middle of the road. We can see it clearly on the body camera footage. And at that point, my client tows the truck away pursuant to police direction. So on these facts, Mr. Camici sued my client for unlawful seizure under the Fourth Amendment, breach of the Texas Theft Liability Act, and liability under Texas Occupations Code Section 2308. And it's on these facts that the district court dismissed Mr. Camici's case. Now, the district court did not err for three distinct reasons. One, the tow was not wrongful by plain language of the statute. Two, Mr. Camici lacked Fourth Amendment standing to bring his claim. And three, notwithstanding issues one and two, my client's actions were covered by the community caretaking doctrine, which is an exception to the warrant requirement for Fourth Amendment seizures. Now, the first issue is relatively easy to dispel with. And I think that co-counsel did a good job of summarizing the statute. It's this idea that Mr. Camici had a right to interfere with the tow. He did not. The statute's very clear that all of this, whether he can regain his vehicle, whether he can pay a drop fee. All of this only applies before the vehicle's removal from the property. This is a defined term. And he gave the definition once, but we did miss one portion of this. It says, as used in this chapter, this term is in reference to a vehicle parked on property other than a public roadway and shall mean the time period until the tow truck enters a public street, road, or highway. This entire transaction, this entire incident happened in a public roadway. There was no point that Mr. Camici had a right to intervene with my client. You can't jump in the truck there and stop the tow. No, of course not. I mean, it's the same idea as once we get this truck, whether it's partially hooked up or not, say we're partially hooked up and he drives on the street and he stops at a stoplight before he gets somewhere to re-hook the truck. We wouldn't allow people to jump in the middle of the street where he parked at a stoplight to interrupt a tow truck driver and say, I have a right to get my truck back. No, we've crafted the statute. In order to account for the situation that, yes, if you show up before the truck's removed, no harm, no foul. You need to either pay the drop fee if you're fully hooked up or you don't have to pay the drop fee if you're not fully hooked up. But that's not what happened here. We were in the middle of the street. We've already left the public property. Right. But to the extent your client was willing to let him pay the drop fee and still go on his way. Well, correct. But that doesn't impact your case, does it? No, because what I would say is, honestly, at that point, Your Honor, it seems like he was doing him a favor or trying to be. He was just trying to be nice about it. Right. It was outside of the statute, outside of the Supreme Court. To de-escalate everything. He wasn't required to. But he was offering him something that he didn't have to offer him. Correct. Yes, Your Honor. And I think that this idea that he, that at no point was this wrongful, it weighs to Mr. Camici's standing, whether or not he had a right in this vehicle to claim, assert a claim for a Fourth Amendment seizure against my client. Now, the Fourth Amendment protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. Now, as this Court explained in United States v. Gaulden, Mr. Camici's right to Fourth Amendment protection turns on whether he has a constitutionally protected property interest or a judicially conferred reasonable expectation of privacy in the place or thing searched or seized. The Court analyzes these searches by considering whether the defendant has a possessory interest in the personal property, whether he exhibited a subjective expectation of privacy in that personal property, and whether he took normal precautions to maintain that expectation of privacy. Now, I would say that the pleadings and the body camera footage established that Mr. Camici took no precautions, let alone normal ones, to maintain his expectation of privacy in this truck. Vehicle's red tag is abandoned. He didn't interrupt the tow until after the truck was moved to the street. Mr. Camici didn't even have keys to roll up the window to view the red tag, which my client had previously rolled down the window, rolls up the window to show the red tag and says, hey, look, this is why I'm towing the truck. It's right here. And it's only at that point that he even reads it for the first time. So this truck's been abandoned for a week. He's essentially abandoned any claim of privacy interest in this vehicle. There is a line of cases also from this Court that you cannot manifest a reasonable expectation of privacy in an item once it's been abandoned. That's from U.S. v. Barlow in 1994. And then ultimately, even if he's pled standing sufficient to survive this Rule 12b6 motion, the seizure in question is subject to a community caretaking exception to the Fourth Amendment's warrant requirement. As this Court noted in Degenhart v. Bentliff, under this exception, police may impound vehicles in furtherance of public safety, community caretaking functions, removing disabled or damaged vehicles, and automobiles that violate parking ordinances. And this dates back to 1976 in Opperman, where the Supreme Court said that the rights of police to impound vehicles pursuant to public safety is beyond challenge. Do we have to even go there? I mean, could we just see this as a continuity of what started in the parking lot? Yes. It's just pursuant to the red tag, and it got interrupted, and then it got continued. Absolutely. It could be either or. Right. I think just in the interest of being thorough, all of these reasons are why, you know, we can't hold my tow truck driver liable for a seizure under the Fourth Amendment. I mean, to do so would be to effectively impose strict liability on tow truck drivers that are just responding to police direction at all points of this tow. I mean, the police called him to come out, towed the truck. And then once Mr. Camichi gets arrested, the pleadings, body camera evidence, everything shows my client had no part in it. They tell him to take the truck on his way, and he does. For that reason, there's no reason why this court should not affirm the district court's decision. And I have no further argument. Thank you, Your Honor. Thank you. Your Honors, I just want to clarify a couple of things. At the 12B6, the complaint controls. There's been discussion about how long the vehicle was abandoned or how long it was sat there. That's not in the complaint, right? There was discussions about, you know, how it was moved from the property or what. All of these things just simply weren't in the complaint. I will say this, though. Under, so we brought state. But it was red-tagged. It was red-tagged, yes, Your Honor. And that's in the video. Yes, we acknowledge it's red-tagged. Under the ordinance, it says, if the owner, authorized operator, or authorized agent of the owner attempts to retrieve the motor vehicle before its removal, they have an absolute, excuse me, before its removal from the property, the vehicle owner or operator has absolute right to regain possession of the vehicle by payment of the drop fee. And in the event that they arrive to move the vehicle before it's fully hooked up, then no drop fee may be charged. And the fully hooked up, it's a defined term that essentially you have to drive away. Tow truck driver acknowledges he wasn't hooked up. However, to Judge Graves' question about which category, I will concede. If the court says that my client does not fall under either of those categories, then I think the state law claims against the tow truck operator do fail. And the reason that is is because we do think they're standing under United States v. Byrd. But specific to the protections of the ordinance, if the court says he doesn't meet it, then it doesn't matter because the other issues under the state law claims pertain to the unlawful Texas Theft Liability Act, taking it without permission, and then also charging an excessive fee to get it back. They charge them $1,400 to get the vehicle back. But if the contention is, you know, so that was part of the issue of the state law claims. But at the end of the day, that's not the crux of what our claim is. The crux of our claim today that we want to move forward is that Officer Pethel told Mr. Kamichi he was free to leave. And then when he tried to leave, she detained him and then threatened to arrest him. And then she did when he refused to identify himself. And so could she have, if she needed his name for her report, could she? Arrest him for failing to, why couldn't she, to the extent that's a separate reason, I have to have it for my report. Yes, Your Honor. So the state law is clear. The federal law is clear that they are only able to compel identification of somebody if there's a lawful arrest. They can always ask for the name. They can always investigate. But there's no requirement that a suspect or an individual. And they refuse to give all the time. That's right. Yes, Your Honor. Well, could she have a basis for a lawful arrest and exercise some discretion on the scene to not arrest? In other words, I'm negotiating with you. You tell me your name and I'll forget about all of this obstruction you did. If you don't tell me your name, I'm taking you in. Yes, Judge, under that. Couldn't she have the discretion on the scene to do that? Officers always have discretion to exercise arrest. But what our contention is that did not happen here because the whole discussion was whether or not they were going to tow the vehicle. And whether or not Mr. Camichi was going to get it back. Once the decision was it was going to be towed and he accepted that fact and he said, okay, you're free to go and begins to walk away. It's at that point she decides to stop him from leaving and escalates it. So there was never any discussion about him leaving. I want to be clear that. But the basis for the arrest that already occurred. Well, we don't we don't know. I understand you understand the argument is that's not that's not why she said I'm arresting you at the time in that moment. She said, just tell me your name or you're going to be arrested. But he had already obstructed. She already had a basis for an arrest. So I would disagree with that for two reasons, Your Honor. The first is when she arrived on the scene, what she observed was he was already out of the vehicle. He was not interfering. The one who would have made that decision, if there was interference, would have been Officer Hamilton. He made no decision to do that. But if I assume he had interfered, then is it lawful for her to negotiate with him and say, I've got a basis to arrest you? I know she didn't say I've got a basis to arrest you already. I won't if you just tell me your name, because I'd love to have that in my report. I'm doing a report on who I talked to who was on the scene. I'd love to put your name in the report. Just tell me your name. I want to arrest you. If you don't, I'm taking you in on the obstruction. She has that discretion on the scene. So if there was probable cause for the interference and she intended to arrest and she made that clear and said, Your Honor, exercise some kind of show of authority to arrest him. Yet the officer has every right to do discretion. But what we have here, and I want to make clear, I know they read off the definition of interference, but they missed a critical component. It has to be with criminal negligence, which is specifically designed or, sorry, defined as a gross deviation from the actor's standpoint. Nobody on that scene thought that Camichi was being unreasonable, at least that's our position at 12b-6, that he was being unreasonable, asserting that he had a right to recover the vehicle. But once they told him get out of the vehicle, even though he was verbally challenging them, he got out of the vehicle. When they said we're towing the vehicle, he was verbally challenging, but he said, OK, I understand you're towing the vehicle. It was the clear escalation point by those five statements that are on the video from Officer Pethel was tell me your name before you leave. I'm now detaining you. Give me your name. If you don't give me your name, you're under arrest. It is objectively clear at the, you know, at the 12b-6 standard at the very beginning that the purpose was for arrest was he refused to give his name, and they're trying to bootstrap that with an after-the-fact post hoc, maybe he was interfering, unless you have any other questions. That's all I have. Thank you. Thank you. We appreciate your arguments here today, all of them, and the case is submitted. The court will stand in recess until 9 a.m. tomorrow.